Filed 2/23/15  P. v. Marion CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VICTOR LEE MARION,<br><br>    Defendant and Appellant. | D064513<br><br><br>(Super. Ct. No. SCD241068) |

APPEAL from a judgment of the Superior Court of San Diego County, Peter L. Gallagher, Judge.  Affirmed.

Dawn S. Mortazavi, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Tami Hennick and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

Following a bench trial, the court found defendant and appellant Victor Lee Marion (Marion) guilty of manufacturing concentrated cannabis in violation of Health

and Safety Code[1] section 11379.6, subdivision (a).  Marion appeals, contending he was improperly prosecuted under section 11379.6 instead of section 11358, which prohibits the cultivation, harvesting, or processing of marijuana.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On May 15, 2012, San Diego County Sheriff Deputy Kevin Ralph investigated a possible marijuana grow at a house in Poway rented by Marion and codefendant Danica Parabot (Parabot).[2]  The home was located on a hillside in a residential community.  Deputy Ralph explained to Marion the purpose of his visit was to verify the size of the grow.  Marion admitted having around 66 marijuana plants.  He also admitted to selling the marijuana.  Marion provided medical marijuana cards for himself and Parabot.

Marion gave Deputy Ralph permission to enter the property.  In addition to the house, the property contained a shed and a plastic greenhouse-like structure.  Deputy Ralph saw over 90 marijuana plants inside the greenhouse.  Thereafter, Deputy Ralph referred the case for further investigation.

On May 18, 2012, United States Drug Enforcement Administration (DEA) agents executed a search warrant on Marion's property.  Inside the greenhouse, agents discovered ventilation fans and roughly 90 marijuana plants in five gallon buckets.  Inside a garage attached to the residence, agents found four marijuana plants growing under electric lamps and a large plastic tub containing marijuana bud.  Some of the

---

[1]     All statutory references are to the Health and Safety Code unless otherwise specified.

[2]     Parabot pled guilty to manufacturing concentrated cannabis (§ 11379.6, subd. (a)) on January 15, 2013 and was sentenced to formal probation.

marijuana appeared to be drying.  Approximately 154 marijuana plants were found in a large outside trash bin.  Inside the house, agents found 59 marijuana clippings that had been individually placed in plastic cups containing water.  Agents also found a Pyrex dish, glass containers, scales and utensils, all of which contained marijuana oil residue.

When the agents searched in and around the shed, they found an extraction device, 26 used and 10 unused butane containers, broken glass containing marijuana oil and a document describing how to make and use the extraction device.  The extraction device was made of a trash can and PVC pipe.  The PVC pipe had a cap on one end and a filtering device made of coffee filters on the other end.  The inside of the PVC pipe contained 61.8 grams of filtered marijuana plant material.

In all, agents found 307 marijuana plants, 2,472.60 grams (nearly two and a half kilos) of processed marijuana and over 7.5 grams of marijuana oil on the property.  Marion's shed was determined to be a chemical extraction laboratory pursuant to DEA criteria.

In August 2012, the People charged Marion with one count of manufacturing concentrated cannabis in violation of section 11379.6, subdivision (a).  The parties stipulated to a bench trial.  DEA Forensic Chemist Layne Higgins testified at trial as the People's expert on concentrated cannabis.  Higgins opined Marion manufactured concentrated cannabis through chemical extraction using butane.  Higgins explained that a chemical extraction process involves placing a chemical with some other matter in order to separate a specific substance from that matter; that the marijuana plant contains Delta-9-Tetrahydrocannabinol (THC), the psychoactive ingredient in marijuana; that "hash oil" or "honey oil" are concentrated forms of THC; and that a solvent is used to

3

extract THC from marijuana, which is then collected and dried out. Higgins noted that butane is a common solvent used in this process. Butane chemically extracts THC from the marijuana plant, separating it from the plant matter.

Higgins also testified about the dangers of butane. If inhaled in an enclosed space, butane can cause asphyxiation. If touched, butane can result in burns or frostbite. In addition, Higgins noted butane is a very flammable liquid. When used in the extraction process, butane typically comes in a compressed can. A can must be manually depressed in order to release butane into an extraction device. The most common way to extract THC from marijuana is to use a PVC pipe with a cap at one end that attaches to the butane can, and a filter at the opposite end to filter the plant material. The butane mixes with the pure THC, which is then usually collected on a glass dish. This material is heated to evaporate the butane, leaving only the concentrated THC. DEA Agent Justin Faw opined this type of chemical extraction can result in explosions and serious personal injuries.

As noted, the trial court found Marion guilty of violating section 11379.6, subdivision (a). Marion timely appealed.

DISCUSSION

Marion contends he should have been prosecuted under section 11358. He contends section 11358, rather than section 11379.6, subdivision (a), applies because it is the more specific statute that pertains to the cultivation and processing of marijuana. Marion contends this error precluded the trial court from dismissing the charge under the Compassionate Use Act of 1996 (§ 11362.5; the Act) and the Medical Marijuana

4

Program Act (§ 11362.7 et seq.; the MMPA) because he held a valid medical marijuana card.[3]

It is axiomatic that the interpretation of a statute presents a pure question of law that we review de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432; *People v. Milstein* (2012) 211 Cal.App.4th 1158, 1164.)

I.

Applicable Law

A. *Production of Concentrated Cannabis Generally*

Section 11358 governs the unauthorized cultivation, harvesting, or processing of marijuana. Section 11358 states: "Every person who plants, cultivates, harvests, dries, or

_____

[3] As Marion correctly asserts, the Act provides a defense for qualified patients and their primary caregivers "who possess[] or cultivate[] marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." (§ 11362.5, subd. (d).) However, the Act also states, "Nothing in this section shall be construed to supersede legislation prohibiting persons from *engaging in conduct that endangers others*, nor to condone the diversion of marijuana for nonmedical purposes." (*Id.*, subd. (b)(2).) Thus, the Act does not protect against a charge of manufacturing concentrated cannabis by means of chemical extraction given the inherent dangers associated with such a process. Similarly, the MMPA prohibits criminal liability from being imposed upon a "qualified patient or a person with an identification card who transports or processes marijuana for his or her own personal medical use." (§ 11362.765, subd. (b)(1).) Specifically, the MMPA prevents "criminal liability under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570." (*Id.*, subd. (a).) However, the MMPA does not include, nor serve as a defense to, section 11379.6. Given our conclusion *post* that Marion was properly prosecuted under section 11379.6, the MMPA is inapplicable in this case. Even assuming arguendo the MMPA was a defense to a charge under section 11379.6, the MMPA does not "authorize any individual or group to cultivate or distribute marijuana for profit." (§ 11362.765, subd. (a).) Here, Marion admitted to selling the marijuana and would therefore fall outside the MMPA's protection.

processes any marijuana or any part thereof, except as otherwise provided by law, shall be punished by imprisonment."

Section 11018 specifies that "marijuana" includes "all parts of the plant Cannabis sativa L., whether growing or not; the seeds of that plant; *the resin extracted from any part of the plant*; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin. . . ."  (Italics added.)

The statutory definition of "concentrated cannabis" also includes resin extracted from marijuana.  Section 11006.5 provides that "concentrated cannabis" includes "the separated resin, whether crude or purified, obtained from marijuana."

Thus, as a general matter, section 11358 applies to the extraction of marijuana resin to produce concentrated cannabis.

B.  *Production of Concentrated Cannabis Through Chemical Extraction*

Section 11379.6, subdivision (a) prohibits marijuana production specifically by means of chemical extraction or chemical synthesis.  It provides, "Except as otherwise provided by law, every person who manufactures, compounds, converts, produces, derives, processes, or prepares, *either directly or indirectly by chemical extraction* or independently by means of chemical synthesis, *any controlled substance* specified in Section 11054, 11055, 11056, 11057, or 11058 shall be punished by imprisonment . . . ."  (Italics added.)

Section 11054, subdivision (d)(13) lists "marijuana" as a Schedule I hallucinogenic controlled substance.  THC is also listed as a Schedule I hallucinogenic controlled substance.  (§ 11054, subd. (d)(20).)  While neither "concentrated cannabis" nor "marijuana resin" is specifically mentioned in the statutory schedules of controlled

6

substances, both are components of marijuana and are thus included within the statutory definition of "marijuana."  (§§ 11018 [defining marijuana to include its resin], 11006.5 [defining concentrated cannabis as the resin separated from marijuana].)

## II.

## Marion Was Properly Charged Under Section 11379.6

A.  *Section 11379.6 is the More Specific Statute*

Marion contends he should have been charged under section 11358 because it is the more specific statute governing the production of marijuana.  (See, e.g., *In re Williamson* (1954) 43 Cal.2d 651, 654 [reasoning where two statutes apply to the same conduct, the state must prosecute the defendant under the more specific statute].)  Marion acknowledges that the Second Appellate District rejected this identical argument in *People v. Bergen* (2008) 166 Cal.App.4th 161 (*Bergen*).[4]

Marion's activities were nearly identical to the defendant's activities in *Bergen*.  In that case, the defendant used chemical butane and an extraction device comprised of PVC pipe to extract THC from marijuana plants to produce concentrated cannabis.  (*Bergen*, *supra*, 166 Cal.App.4th at pp. 165-166.)  The People charged defendant with violating section 11379.6, subdivision (a).  (*Bergen*, at p. 164.)  On appeal, the defendant, like Marion here, argued that "because section 11358 is specific to marijuana processing, it controls over section 11379.6(a)'s general prohibition against the manufacture of controlled substances."  (*Id.* at p. 167.)

---

4      The record also indicates Marion's trial counsel brought to the trial court's attention a then-pending case in the First Appellate District on the same issue as *Bergen*. That case was decided in a nonpublished opinion shortly after Marion's trial concluded. (*People v. Schultz* (May 20, 2013, A134582).)  The *Schultz* court followed *Bergen*.

7

The *Bergen* court rejected this argument, concluding section 11379.6, subdivision (a) was the more specific statute because it focused on the specific processes used to develop controlled substances, such as marijuana. (*Bergen*, *supra*, 166 Cal.App.4th at p. 169.) The court reasoned that "[u]nlike the general prohibitions in section 11358, the focus of section 11379.6(a) is on the particular *processes* employed to produce a controlled substance—by chemical extraction or chemical synthesis. Stated differently, section 11379.6(a) does not simply make unlawful the processing of concentrated cannabis as does section 11358. It prohibits and punishes the specific *means* used to process marijuana plant material into concentrated cannabis. In this sense section 11379.6(a) is a more narrowly drawn statute, covering only specific methods of processing 'marijuana'—which by statutory definition includes concentrated cannabis." (*Ibid.*) The *Bergen* court noted the "conclusion section 11379.6(a) applies to the production of concentrated cannabis by means of chemical extraction is reinforced by a 1991 opinion of the California Attorney General." (*Ibid.*, citing 74 Ops.Cal.Atty.Gen. 70, 75 (1991).) That report stated a "chemical extraction" under section 11379.6, subdivision (a) would include "'the extraction of resinous THC [tetrahydrocannabinol] or hashish from marijuana.'" (*Bergen*, at p. 170.)

We agree with *Bergen* that section 11379.6, subdivision (a) is the more specific statute. Marion's argument—that section 11358 "is more specific in that it only criminalizes the manufacturing of concentrated cannabis" while section 11379.6 generally "criminalizes the manufacturing of many controlled substances"—fails to recognize the legislative history of section 11379.6.

8

When section 11379.6 was enacted in 1985 (stats. 1985, ch. 3, § 8), section 11358 already had been on the books for more than a decade (stats. 1972, ch. 1407, § 3) and already made it a felony to cultivate marijuana. Thus, section 11379.6 was not meant to punish the production of marijuana generally but rather the specific situation "presented by the dangers inherent in the chemical production, processing, and preparation of controlled substances." (*Bergen*, *supra*, 166 Cal.App.4th at p. 170.)

B. *The Legislative Intent of Section 11379.6 Includes Marion's Activities*

Marion further contends the Legislature "did not intend the chemical extraction process [of section 11379.6] to include the manufacturing of concentrated cannabis, but only to include the chemical extractions taking place in methamphetamine laboratories." We reject this narrow reading of section 11379.6.

The plain text of section 11379.6 contradicts Marion's argument. Section 11379.6 applies to anyone who "manufactures, compounds, converts, produces, derives, processes, or prepares, either directly or indirectly by chemical extraction . . . *any controlled substance* specified in Section 11054, 11055, 11056, 11057, or 11058 . . . ." (Italics added.) As noted, section 11054 lists both "marijuana" and THC as Schedule I hallucinogenic controlled substances. (§ 11054, subd. (d)(13), (20).) As also noted above, "concentrated cannabis" and "marijuana resin" are both components of "marijuana" and are included within its statutory definition. (See §§ 11018 [defining marijuana to include its resin], 11006.5 [defining concentrated cannabis as the resin separated from marijuana].) Thus, Marion's claim that section 11379.6 does not include the manufacturing of concentrated cannabis is without merit.

9

Moreover, as *Bergen* recognized, "[t]he Legislature [in enacting section 11379.6] apparently intended to punish more harshly *the use of chemicals in the production of controlled substances* because of the dangers posed to the public from the use of hazardous substances, such as fires, fumes or explosions." (*Bergen*, *supra*, 166 Cal.App.4th at p. 170, italics added.) The *Bergen* court continued: "The legislative history of section 11379.6 further indicates the Legislature decided use of chemicals in producing controlled substances warranted more severe punishment." (*Id.* at p. 171.) As evidence, *Bergen* referenced a report to the Senate Committee on the Judiciary, which stated the purpose of section 11379.6 was "'to deter the operation of clandestine drug laboratories,' with another purpose of the bill being to 'create a separate offense of manufacturing *any* controlled substance.'" (*Bergen*, at p. 171.) We again agree with *Bergen* on this point and thus reject Marion's contention that section 11379.6 applies only to "the chemical extractions taking place in methamphetamine laboratories."

Marion's unlawful activities fit squarely within section 11379.6, subdivision (a). Marion used the solvent butane to extract marijuana resin in producing concentrated cannabis. As noted by the experts in this case, butane is known to be dangerous: it is a flammable liquid, can cause asphyxiation if inhaled, and can result in frostbite if touched. DEA Agent Faw testified that chemical extraction using butane can lead to explosions and serious personal injuries. Marion manufactured and chemically processed the concentrated cannabis in an outside shed deemed a chemical extraction laboratory by DEA guidelines. The shed was located next to a house situated on a hillside in a residential area. The trial court noted this area also constituted a "fire zone." Marion's activities posed a risk of fire to the shed, residence, and nearby community. Thus, we

10

conclude substantial evidence in the record supports Marion's conviction under section 11379.6, subdivision (a).

Like in *Bergen*, "[Marion's] arguments to the contrary lose sight of the fact he was not simply charged with producing or processing concentrated cannabis from marijuana plant material. He used a flammable solvent in the process of extracting the marijuana resin. It is *this* act—the use of a chemical in the extraction process—which formed the basis of the charge for manufacturing concentrated cannabis under section 11379.6(a)." (*Bergen*, *supra*, 166 Cal.App.4th at p. 173, fn. omitted.)

## DISPOSITION

The judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

NARES, J.

IRION, J.